

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:FJN/SKW                                      *271 Cadman Plaza East*
F. #2020R00809                                   *Brooklyn, New York 11201*

June 1, 2022

By ECF and E-mail

The Honorable Sterling Johnson, Jr.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Jeremy Trapp
                Criminal Docket Nos. 20-308 and 20-454 (SJ)

Dear Judge Johnson:

        The government respectfully submits this letter in advance of the defendant Jeremy Trapp's sentencing in the two cases captioned above, which is currently scheduled for June 7, 2022, at 10:30 a.m. The defendant pled guilty to the top counts of two separate indictments. The first indictment relates to the defendant cutting a brake line of a New York City Police Department ("NYPD") vehicle. See 20-CR-308. The second indictment relates to the defendant submitting a fraudulent application to obtain more than $50,000 of COVID-19 relief funds. See 20-CR-454.

        For the reasons set forth below, the government submits that sentence of 18 months in custody, at the top of the United States Sentencing Guidelines (the "Guidelines") range contemplated by the plea agreement and calculated by the United States Probation Department, is sufficient, but not greater than necessary, to achieve the goals of sentencing in these two cases.

I.    Factual and Procedural Background

    A.   Destruction of an NYPD Vehicle

        As set forth in the Presentence Report ("PSR"), on July 17, 2020, the defendant crawled under an NYPD vehicle which was parked on a busy residential and commercial street near the intersection of 4th Avenue and 42nd street in Brooklyn, New York, just a few blocks from Sunset Park and Prospect Park. (PSR ¶ 9.) In broad daylight,

the defendant attempted to cut the NYPD vehicle's main brake line, which would have left the vehicle without brakes.  (Id.)  The defendant's actions partially severed a similar looking line in the same area as the brake line that is associated with the vehicle's anti-lock braking system.  (Id.)  The damage done by the defendant affected the vehicle's stopping power and maneuverability, and would have seriously impacted a law enforcement officer's ability stop and maintain control of the NYPD vehicle in an emergency.  (Id. ¶ 10.)

A still image from a video of the defendant crawling underneath the NYPD vehicle and cutting the brake line associated with the anti-lock braking system is below:



An image of the defendant fleeing after cutting the brake line is depicted below:



The defendant's attack on the NYPD vehicle was a continuation of his stated desire to harm police officers and a product of the defendant's deliberate planning. Beginning several days earlier, on July 13, 2020, the defendant bragged to a Confidential Source ("CS") that he had previously destroyed property and burned a police car.  (Id. ¶ 7.) The defendant lamented to the CS in a recorded conversation that burning police cars only resulted in a burned car (i.e. property damage) and that he wanted to raise the stakes.  (Id.) Specifically, the defendant told the CS that he wanted to burn NYPD precincts and cut the brake lines on police cars.  (Id.)  The defendant also stated that he thought police were racist and he wanted to harm police officers and their supporters, presumably civilians.  (Id.)

Over the next few days, the defendant began planning for various attacks.  On July 15, 2020, the defendant told the CS that he wanted to burn down the Verrazzano-Narrows Bridge so that "white supremacists" could not use it to get to Brooklyn from Staten Island, and that he wanted to conduct "reconnaissance" on the bridge.  (Id. ¶ 8.)  The defendant reiterated that he wanted to harm police officers by cutting the brake lines on police cars and burning down police precincts.  (Id.)  The next day, furthering his stated goal, the defendant traveled to the Verrazzano-Narrows Bridge to take photographs of the bridge as part of his plan to burn it down.  (Id.)  After conducting his reconnaissance, the defendant drove around Brooklyn looking for an unattended police car so he could cut the brake line.  (Id.)  Unable to locate a suitable police vehicle, the defendant resumed his search the following day, on July 17, 2020, at which time he crawled under a police vehicle and cut a brake line in the middle of the day.  (Id.)  After successfully sabotaging the vehicle, the defendant continued to drive around Brooklyn looking for more police vehicles to damage.  (Id.)

### B.  COVID-19 Wire Fraud

The defendant also engaged in wire fraud in connection with the Economic Injury Disaster Loan ("EIDL") Program administered by the Small Business Administration ("SBA"), which provides financial assistance to small businesses that suffered economic consequences because of the COVID-19 pandemic.  (Id. ¶ 11.)

In June 2020, during the height of the pandemic, the defendant filed a fraudulent application for an EIDL loan and grant.  (Id. ¶ 13.)  In his application, the defendant claimed, among other things, that he was the sole proprietor of a car wash business that was located at his home address in Brooklyn.  (Id.)  The defendant further claimed in the application that he had 10 employees and that his gross revenues for the 12 months prior to the COVID-19 pandemic were $150,000.  (Id.)  The defendant, however, never ran a car wash business, let alone one from his home, which was a residential building.  (Id.)  Based on the defendant's false representations and paperwork, the SBA approved a $42,500 loan and $10,000 grant to the defendant.  (Id.)  The SBA disbursed those amounts to the defendant in late June and early July 2020, diverting funding from hardworking members of the community struggling to keep their businesses open.  (Id.)

### C.  The Defendant's Pretrial Release

On or about August 5, 2020, following the defendant's arrest after cutting the brake line of the NYPD vehicle, the Honorable Steven M. Gold ordered the defendant detained.  See ECF No. 6.  On or about January 14, 2021, the Honorable Sanket J. Bulsara released the defendant to home incarceration.  See ECF No. 9.  The defendant subsequently moved to modify the conditions of release from home incarceration to home detention, arguing that the modification was necessary so the defendant could look for employment.  See ECF No. 33.  The defendant's motion was granted on or about May 17, 2021.  Id.

Notably, the defendant has adjusted poorly to his release.  According to the defendant's Pretrial Services Officer, despite having been released from pretrial detention well over one year ago, the defendant has not yet found and maintained employment as of the date of this letter.  Indeed, according to Pretrial Services, the defendant was fired after working one day at a bagel store and was dismissed from a job at Citi Bike before his first day.

II.   The Guidelines Calculation

The PSR sets forth the applicable Guidelines calculation:

Docket Number 20-CR-308 (Destruction of an NYPD Vehicle)

| | | |
|---|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | | 7 |
| Plus:   Offense involved the conscious or reckless risk of death or serious bodily injury (§ 2B1.1(b)(16)(A)) | | +7 |
| Total: | | 14 |

Docket Number 20-CR-454 (Wire Fraud)

| | | |
|---|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | | 7 |
| Plus:   Loss amount exceeded $40,000 (§ 2B1.1(b)(1)(D)) | | +6 |
| Total: | | 13 |

| Grouping Analysis (§§ 3D1.2, 3D1.4) | Units | Level |
|---|---|---|
| 20-CR-408 | 1 | 14 |
| 20-CR-454 | 1 | 13 |
| Highest Offense Level (20-CR-408) | | 14 |
| Adjustment for Multiple Units (§ 3D1.4) | | +2 |
| Combined Adjusted Offense Level | | 16 |
| Less:   Timely acceptance of responsibility (3E1.1(a) and (b)) | | -3 |
| Total: | | 13 |

(PSR ¶¶ 20-39.)

With a total offense level of 13 and Criminal History Category I, the defendant's advisory Guidelines sentencing range is 12 to 18 months in custody. (Id. ¶ 72.)

III.   Legal Standard

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In doing so, [it] may not presume that the Guidelines range is reasonable.  [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).  "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original).  "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." United States v. Aldeen, 792 F.3d 247, 251-252 (2d Cir. 2015), as amended (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in most effective manner."  18 U.S.C. § 3553(a)(2)(D).  "The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding to arrive at the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

IV.    Sentencing Recommendation

The government respectfully submits that a sentence of 18 months, at the top of the applicable advisory Guidelines range, accurately reflects the seriousness of the defendant's conduct and is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case. See 18 U.S.C. § 3553(a).

First, a Guidelines sentence of 18 months accurately reflects the seriousness of the defendant's criminal conduct in cutting the brake line of an NYPD vehicle and committing fraud against the U.S. government.

In cutting the brake line of an NYPD vehicle, the defendant put the entire community in danger. The defendant's actions undoubtedly threatened the lives of the law enforcement officers who drove the NYPD vehicle. The defendant was not just committing property damage. As the defendant said multiple times, his goal was to harm the police. Such harm almost certainly would have occurred had the NYPD vehicle been driven after the defendant's attack. The defendant's actions also put countless civilians in direct danger. An NYPD vehicle with a disabled brake line driving in the middle of the day on 4th Avenue in Brooklyn could have injured or killed dozens of people living and working in Brooklyn.

Notably, the defendant's conduct cannot be minimized as actions taken in the heat of the moment. Rather, the defendant carefully planned and scouted multiple attacks on the police over the course of several days with plenty of time to think through his actions. When the defendant could not find a suitable NYPD vehicle to attack one day, he was undeterred and returned the next day to carry out his plan. Indeed, after cutting the brake line on July 17, 2020, the defendant said he wanted to do it again, and he continued to drive around Brooklyn looking for more vehicles to attack. This is directly in line with the defendant's statements to the CS that he had burned a police car in the past and wanted to do it again.

The defendant's fraud against the U.S. government also caused serious harm the public and warrants a significant sentence.  While many families and small businesses were struggling during the height of the COVID-19 pandemic in June 2020, the defendant chose to file a false application claiming to run a fictitious car wash business.  The defendant's flagrant fraud diverted over $50,000 of relief funds from well-deserving businesses during an especially difficult time and defrauded taxpayers of their hard-earned money.

In short, both of the defendant's criminal schemes required careful planning and forethought.  Both schemes were seriously harmful to the community and should be punished accordingly.

Second, a Guidelines sentence of 18 months is necessary to deter the defendant from committing future crimes.  Together, the defendant's two criminal schemes reflect the defendant's lack of respect for the law.  The defendant brazenly attacked a police car in in broad daylight.  Equally troublingly, the defendant fraudulently stole $50,000 that was supposed to be used to help citizens withstand the devastating economic effects of the worldwide COVID-19 pandemic.  When viewed together, the defendant's pattern of criminal conduct shows the defendant's willingness and eagerness to disobey the law in different ways.

Tellingly, the defendant did not make a mistake on one occasion and immediately course correct.  Instead, the defendant's conduct reflects his repeated decisions to commit crimes over the course of months: the defendant stole $50,000 from the federal government, the defendant admitted to burning a police car in the past, the defendant cut the brake line of an NYPD vehicle, the defendant scouted additional police vehicles to destroy, and the defendant planned to burn down the Verrazzano-Narrows Bridge.  A significant sentence, therefore, is necessary to show the defendant that serious consequences exist for his repeated criminal behavior to deter his future actions.

Notably, the defendant has not used the time since his release from five months of pretrial custody to make significant strides in his life and may not even be permitted to live in his mother's home going forward.  Despite multiple opportunities to obtain employment and despite significant resources expended by Pretrial Services, the defendant has not been able to maintain employment since his bond conditions were relaxed last May to permit him to seek and secure employment.  According to Pretrial Services, the defendant was fired after working one day at a bagel store and was dismissed from a job at Citi Bike before his first day.  In addition, according to the PSR, the defendant has created problems for his mother with her landlord causing his mother to fear she may lose her home. (PSR ¶ 53.)  As the PSR noted, the defendant's mother "does not wish for him to continue residing in her home."  (Id.)  The defendant's own conduct, therefore, does not reflect someone who understands the seriousness of his actions, thus requiring a significant sentence for deterrent purposes.

       <u>Third</u>, a Guidelines sentence of 18 months is appropriate in this case for general deterrence.  The government respectfully submits that when sentencing the defendant the Court should weigh heavily the extent to which the sentence it imposes will deter those who wish to intentionally harm law enforcement officers.  The sentence imposed by this Court should send a clear message to the public that tampering with the brake line of a police vehicle is not merely property damage, and that taking actions that could seriously injure or kill law enforcement officers and the greater public will be met with serious punishment.

V.    <u>Conclusion</u>

       For the reasons set forth above, the government respectfully request the Court to impose a term of imprisonment of 18 months to provide just punishment for the serious offenses that the defendant committed, to promote respect for the law, to deter the defendant from future criminal conduct, and to deter others from engaging in similar criminal conduct in the future.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   <u>/s/ Sara K Winik</u>
     Francisco J. Navarro
     Sara K Winik
     Assistant U.S. Attorneys
     (718) 254-7000

cc:    Clerk of the Court (SJ) (by ECF)
     Leticia Olivera, Esq. (by ECF)
     Erica Vest, U.S. Probation Officer (by e-mail)