```
                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK

-----------------------------X Docket#
UNITED STATES OF AMERICA,     : 20-cr-00308(SJ)(CLP)
                              :
                              :
    - versus -                : U.S. Courthouse
                              : Brooklyn, New York
JEREMY TRAPP,                 :
                              : June 8, 2022
                Defendant     : 11:31 a.m.
-----------------------------X
```

                TRANSCRIPT OF CRIMINAL CAUSE FOR MOTION HEARING
                   BEFORE THE HONORABLE ROBERT M. LEVY
                    UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

**For the Government:**      **Breon S. Peace, Esq.**
                            United States Attorney


                     BY:    **Sara K. Winik, Esq.**
                            Assistant U.S. Attorney
                            271 Cadman Plaza East
                            Brooklyn, New York 11201



**For the Defendant:**       **Leticia M. Oliveria, Esq.**
                            Federal Defenders of New York
                            One Pierrepont Plaza, 16th Fl.
                            Brooklyn, NY 11201




**Transcription Service:**   **Transcriptions Plus II, Inc.**
                            61 Beatrice Avenue
                            West Islip, New York 11795
                            RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                    Proceedings

1          THE CLERK:  We have a Criminal Cause for a

2   Motion to Modify Conditions of Release.  It's 20-cr-308,

3   *United States v. Jeremy Trapp*.

4          Counsel, state your appearances, please,

5   starting with the government.

6          THE COURT:  You can sit down.  It's okay.

7          MS. WINIK:  Good morning, your Honor.  Sara

8   Winik on behalf of the United States.  And with me is my

9   intern.  And if it's okay with the Court, I'd ask that

10   she put her appearance on the record herself.

11          THE COURT:  Of course.

12          INTERN:  Shelby (indiscernible), intern with

13   the office.

14          THE COURT:  Morning.

15          MS. OLIVERIA:  Good morning, your Honor.

16   Leticia Oliveria, Federal Defenders of New York on behalf

17   of Jeremy Trapp who's seated to my left.

18          THE COURT:  Good morning.

19          MS. OLIVERIA:  I'm joined by Vivianne Guevara,

20   a social worker with our office.

21          MS. GUEVARA:  Good morning.

22          THE COURT:  Good morning.  Good morning, Mr.

23   Trapp.

24          MS. GROSS:  Good morning, your Honor.  Jada

25   Gross from Pretrial Services.

3

Proceedings

1          THE COURT:  Good morning.  Okay.

2          MS. OLIVERIA:  Thank you, your Honor.  As the

3  Court is aware, we filed two submissions in connection

4  with our request that Mr. Trapp's bond be modified to

5  remove the condition of electronic monitoring, or in the

6  alternative, allow him to submit to a curfew.  So I will

7  briefly summarize why we think that's appropriate at this

8  point in the case.

9          But I think it's important to emphasize that

10  prior to this case, Mr. Trapp had no history of criminal

11  activity whatsoever.  He does have a history, however, of

12  autism, special education, learning disability, mental

13  health issues, and recent evaluations have revealed that

14  he suffers from severe cognitive impairments.

15          The offense conduct that he has pled guilty to

16  involve two individuals who were directing Mr. Trapp and

17  taking advantage of him.  After spending five months at

18  the MDC Brooklyn in connection with those charges, he was

19  released on bond primarily because he was receiving no

20  mental health treatment whatsoever at the MDC.

21          Since his release in January of last year, Mr.

22  Trapp has done everything that he can to avoid returning

23  to the MDC.  He has engaged in weekly therapy sessions at

24  the New York Mental Health Group.  As set forth in our

25  letter yesterday, he has participated in programming,

4

Proceedings

1  educational programming, vocational programming,

2  internships.  And now he is working with the Doe Fund

3  that has offered him employment cleaning the streets

4  every day full time.  It's a long-term program that will

5  offer him social support services in addition to

6  employment.  The program will also eventually help him

7  secure housing.

8           So one of the reasons that we are asking that

9  he be taken off of electronic monitoring is to allow him

10 to fully focus on participating and ready, willing, and

11 able without the constant concern that he is not

12 complying with his electronic monitoring requirements.

13 He has to send emails containing schedules.  He has to

14 keep his phone on him at work because Pretrial is calling

15 him to figure out where he is.  And I don't want my

16 argument to be construed as any sort of criticism of

17 Pretrial Services or what they are requiring Mr. Trapp to

18 do.  He is on home detention.  And because he's on home

19 detention, they have to monitor him daily and know where

20 he is at every second.

21           We are making this application because after a

22 year and a half, Mr. Trapp has demonstrated that that

23 monitoring is not necessary.  The Pretrial Services

24 office just filed a memorandum explaining the reasons why

25 they're opposing our request that he be taken off

5

Proceedings

1    electronic monitoring.  There is nothing in that memo

2    that suggests Mr. Trapp as a danger to the community or

3    that he presents a risk of flight.  But the memo is is a

4    laundry list of issues that Jeremy has had that are

5    directly attributable to his cognitive impairment and

6    mental health issues.  Arguments with coworkers, which

7    I'll emphasize was because he couldn't understand the

8    schedule that they had given him.  Problems with his job

9    at a COVID testing site.  The fact that he wasn't hired

10   from an internship.  The fact that he showed up to work

11   late once.  I'm not arguing that these things aren't

12   serious, but I think that they are common and expected of

13   someone who is trying to do things that they've never

14   done in their lives.  This is someone that has never had

15   a regular job, never participated in long-term

16   programming, and he's doing everything that he can to

17   succeed.  And of course there have been bumps along the

18   way.  But none of these issues are relevant under the

19   Bail Reform Act and they don't show that electronic

20   monitoring and home detention is necessary to ensure his

21   appearance in court or that he presents a danger to the

22   community.

23          So for those reasons, we are asking that Mr.

24   Trapp be taken off of electronic monitoring with home

25   detention.  Or in the alternative, that he be allowed to

6

Proceedings

1   submit to a curfew.

2           THE COURT:  All right.  Thank you.  Can I hear

3   from the government and then Pretrial Services?

4           MS. WINIK:  Yes, your Honor.  I just want to

5   start by saying defendant is differently situated than

6   somebody who comes to this court on Pretrial release

7   before pleading guilty.  The defendant has pled guilty to

8   two separate incredibly serious indictments.

9           The first is the defendant cut the brake line

10  of a police vehicle.  That put not only police officers

11  in danger, it directly put the entire community in

12  danger.  I can't think of many things more dangerous than

13  a car on a residential street that could have killed any

14  civilian in its path.

15          THE COURT:  Right.  And I think Judge Gold said

16  that at the first hearing.

17          MS. WINIK:  Yes, your Honor.

18          THE COURT:  And the second is stealing over

19  $50,000 of COVID relief funds, funds that are supposed to

20  directly go to struggling businesses in our community.

21  But the defendant has pled guilty to both of those two

22  separate indictments and now he's three months away from

23  sentencing.  It's the defendant's burden to show by clear

24  and convincing evidence that he's not a danger to the

25  community or a flight risk and his own conduct shows that

7

Proceedings

1    he is both of those things.  And we'd ask the Court keep

2    a status quo for three more months pending his

3    sentencing.

4            And the reason we think both things are true is

5    as Pretrial's memo to the Court reads, let me just make

6    clear, the defendant hasn't been fully compliant with his

7    Pretrial release.  There's actually information in the

8    memo that I didn't know about, I was never informed,

9    which is that the defendant disconnected his location

10   monitoring equipment and took it with him outside his

11   residence to try to trick the system into thinking that

12   he was still in his residence.  That's a direct violation

13   of the Court's order, of Pretrial conditions, and shows

14   the defendant doesn't take the requirements of his

15   Pretrial release seriously.  And I'm told that that was

16   fixed but it -- or that he hasn't violated recently, but

17   that shows why continuing the current conditions are

18   necessary.

19           In terms of danger to the community, I --

20           THE COURT:  Do we know when that was?  Maybe I

21   should ask Pretrial Services.

22           MS. GROSS:  It was shortly after his release,

23   your Honor.  It says that in the memo.

24           THE COURT:  Right.

25           MS. GROSS:  January of last year.

8

Proceedings

1        THE COURT:  So that was before the hearing

2   before Judge Bulsara?

3        MS. WINIK:  Your Honor, to be --

4        MS. GROSS:  It was right after.

5        THE COURT:  Do you have any idea when that --

6        MS. GROSS:  Judge Bulsara released him.

7        THE COURT:  Let me ask Pretrial Services.  Do

8   you have any idea when that was?

9        MS. GROSS:  I'm not exactly sure of when that

10  occurred but I do know it was earlier on as stated in the

11  memo right after he was released from custody.

12        THE COURT:  Okay.  And --

13        MS. WINIK:  Your Honor --

14        THE COURT:  -- it was one occasion or was it

15  several occasions?

16        MS. WINIK:  Several.

17        THE COURT:  Do we know?

18        MS. GROSS:  I wasn't supervising him then but I

19  believe it may have been several occasions.  And shortly

20  after Pretrial Services spoke with his counselor at the

21  time, I believe that issue was resolved.

22        THE COURT:  It was resolved.

23        MS. GROSS:  Right.  As far as Mr. Trapp

24  disconnecting the equipment and taking it with him

25  outside of the residence.

9

Proceedings

1          THE COURT:  So to the best of your knowledge,
2     it did not recur after that?
3          MS. GROSS:  No.  And as far as I've been
4     supervising him for the last two months, I haven't had
5     that issue with him as far as him disconnecting the
6     equipment.
7          THE COURT:  Thank you.
8          MS. WINIK:  Your Honor, I spoke to Melissa
9     Roman, Ms. Melissa Roman, who is the supervisory U.S.
10    Pretrial Services officer.  She used to previously
11    supervise Mr. Trapp.  She emailed me a pretty extensive
12    email this morning and unfortunately, she's on intake
13    duty today or else she said that she would be here.  And
14    she reached out to me personally saying that it's
15    Pretrial's position that he should have been detained.
16    It was their position that he be detained initially.  And
17    my recollection, I don't have the dates in front of me,
18    your Honor, but it was an ongoing issue the extent of
19    which was actually never communicated to the government
20    about the location monitoring, the fact that he took it
21    outside of his home.  I thought it was just an equipment
22    issue.
23          But besides that, what the government is asking
24    is just to keep the requirements in place.  There's
25    nothing the defendant can't currently do while on home

Proceedings

1   detention.

2          My understanding, and I believe Pretrial can

3   speak to this better than I can, is that he's given a lot

4   of flexibility by Pretrial to get the services he needs,

5   to get the employment and the scheduling he needs.  What

6   our requirements do is make sure that he checks in with

7   Pretrial, that they know where he is, that we can ensure

8   by these conditions that he doesn't sabotage another

9   vehicle that could harm the community, that he doesn't

10  flee pending sentencing.  Sentencing is three months

11  away.  The defendant faces a significant in-custody

12  sentence that the government has asked for.  And we

13  believe his incentive to flee has only increased with the

14  risk of sentencing coming up sooner.

15         So we'd ask -- there's just no basis to modify

16  what has semi-been working for the past year pending his

17  sentencing.  We're not talking about waiting for a trial.

18  We're talking about somebody who's already admitted his

19  guilt to two serious felony convictions and we're three

20  months away from the Court sentencing him.

21         THE COURT:  So are you saying that Ms. Roman

22  has some information that no one else has that would be

23  relevant to today's hearing?

24         MS. WINIK:  Your Honor, I believe that Ms.

25  Roman put most of it in the memo.  She's the one that

11

Proceedings

1    just supervised him.  She supervised him more than two

2    months.  So she's been supervising him for a significant

3    amount of time.

4             THE COURT:  Could I hear from Pretrial

5    Services, please?

6             MS. GROSS:  Yes.  Good morning, your Honor.  So

7    as stated by the government, we are not consenting to Mr.

8    Trapp taken off of the location monitoring.  Also stated

9    by the government, in regard to Mr. Trapp's schedule, he

10   is currently working with the Doe Fund.  He does work I

11   think now Monday to Friday, sometimes Saturdays and

12   Sundays.  He has been given a set schedule by the Doe

13   Fund.  In return, we are also giving him a schedule and

14   allowing him to leave earlier than we would normally

15   allow those on home detention to leave.

16            I do think that it is important that we are

17   able to track Mr. Trapp's movements in regards to being

18   able to see where it is that he's going and him having a

19   schedule where he's allowed to go work and then come back

20   home.  So we don't believe that him being taken off of

21   location monitoring is something that's necessary at this

22   time.  And I believe also stated by the government, we do

23   feel that that's something that's working now as far as

24   him being given a schedule, us giving him a schedule

25   allowing him to go outside and work for a certain amount

12

Proceedings

1  of time throughout the day.

2          THE COURT:  Yes.  Can I hear from the defense?

3          MS. OLIVERIA:  Your Honor, first of all, with

4  respect to the issues with disconnecting the monitoring

5  device, I think the seriousness of those issues is

6  demonstrated by the fact that there was no violation

7  memo.  As your Honor is well aware, whenever someone

8  commits a significant violation of their Pretrial

9  release, a memo is filed with the Court and the Court is

10  informed even if it's the case that the Pretrial Services

11  office doesn't believe that the violation warrants any

12  action.  It's not uncommon for defendants who have just

13  been released on home detention to sometimes move the

14  monitor, see if they can stand outside, get some fresh

15  air.  These are normal things that happen at the

16  beginning of someone's release and they weren't serious

17  enough in this case for any memo to be filed for the

18  Court.  And as far --

19          THE COURT:  Let me stop you there for a second.

20  The Pretrial Services memo says that with respect to

21  seriousness, I think it underlines what you're saying

22  actually.  It says that he was disconnecting the location

23  monitoring equipment from its electrical source and

24  leaving the home during unauthorized times to hang out in

25  the hallway and lobby of his building.  So it sounds as

Proceedings

1    though, I mean unless I hear otherwise, that that's all

2    he did was he just went out in the hallway.

3                MS. OLIVERIA:  That's all he did.

4                THE COURT:  He didn't leave his building.

5                MS. OLIVERIA:  Mr. Trapp lives --

6                THE COURT:  And that it's been resolved since.

7                MS. OLIVERIA:  Yes.  He lives in a tiny

8    apartment that he shares with three people, three other

9    people.  Sorry, four other people.  And like many

10   defendants who are on home detention in small homes,

11   sometimes they try to see if they can sit by a window, if

12   they can get to the backyard, if they can be in the

13   hallway just to get some fresh air.  He was instructed

14   that he cannot do that and he stopped.

15               Now as far as why it would be better to keep

16   him on electronic monitoring, I don't believe that

17   there's been any reason provided to the Court about why

18   that is better or necessary to ensure that he doesn't

19   present a danger to the community or a risk of flight.

20   This is someone that's been out for a year and a half

21   without doing anything that comes close to being criminal

22   activity, violent, or aggressive behavior.

23               Now as far as the government's claim that

24   there's nothing that he's not allowed to do while on home

25   detention, Mr. Trapp cannot stop at a McDonald's on the

14

Proceedings

1    way to work to get breakfast.  He recently did that and

2    was admonished.  Mr. Trapp cannot do laundry without

3    asking for permission first.  He cannot take a walk

4    around the block if he needs some fresh air.  He cannot

5    get food if he's hungry without first asking for

6    permission.  He can't go to the bank, can't cash his

7    paychecks.  He cannot do anything without first emailing

8    Pretrial Services and asking them to allow it which

9    requires him to give them notice 48 hours in advance.  So

10   there's quite a bit that he can't do while he's on home

11   detention.  The only things that he's doing right now are

12   going to work, going to therapy, doing his laundry, and

13   buying food during the limited time that he's given

14   permission to do so every week.

15        The other thing that he's not allowed to do is

16   ignore his phone when he's at work.  As part of his job,

17   he's not allowed to pick up the phone while he's working.

18   And he's already had issues asking whether he can keep

19   his phone on him because he has to pick up when Pretrial

20   calls him.

21        THE COURT:  The Doe Fund people don't make

22   allowances for that?

23        MS. OLIVERIA:  I mean they do, but not every --

24   we've had to talk to the director and a supervisor about

25   this issue, but it is something that is a problem.

15

Proceedings

1      THE COURT:  Has it been resolved?

2      MS. OLIVERIA:  No, your Honor.  And the

3  Pretrial Services office is aware of this issue and what

4  they've told Mr. Trapp is this is a condition of your

5  release, which it is.  I understand.  Whenever they get

6  an alert and they're not sure where he is, they have to

7  call him and he has to pick up.  And this is the sort of

8  monitoring that we think is excessive based on Mr.

9  Trapp's compliance and the fact that -- we're not asking

10  that he be taken off of electronic monitoring so that he

11  can go out on the weekend or anything like that.  It's

12  just to allow him to devote all of his efforts and

13  attention to working and participating in the Doe Fund.

14  He has earned that after a year and a half on home

15  detention.

16      MS. GROSS:  Your Honor, in regards to Mr. Trapp

17  not being able to keep his cell phone on him, that is

18  true from what he's told me as far as him working and

19  being out on the streets and cleaning up, and that's

20  something that Pretrial Services does acknowledge and we

21  do understand.  I've spoken to Mr. Trapp about it.  There

22  was an incident I believe maybe sometime last week where

23  somebody that was on duty as far as watching his

24  movements did notice that he I believe didn't enter, or

25  he didn't get home at the time that he was supposed to

16

Proceedings

1  get home, something of that nature.  So I just explained

2  to Mr. Trapp that it's not something that he's being

3  punished for.  He's not in trouble.  That officer does

4  have to acknowledge an alert if they get one.  And that

5  can be resolved by his schedule being extended to maybe 4

6  o'clock he has to be home instead of 3.  That would allow

7  him for time to return back from wherever he was working

8  on the streets back to the base at the Doe Fund, and then

9  from there back to his residence.  So that's something

10 that could happen to resolve that specific issue.  But as

11 his officer that's supervising him, I'm aware already

12 that he's not allowed to have his phone on him and I've

13 spoken with the director at the Doe Fund, I spoke with

14 Mr. Trapp, so that's something that I'm aware of.  And I

15 guess we do acknowledge that point.  So --

16         THE COURT:  And there's nothing that the Doe

17 Fund will do about that?

18         MS. GROSS:  I mean I'd have to speak to them

19 and see.  I mean for us, and like I said for me

20 supervising him, I understand that that's their protocol

21 and that's their policy.  So like I said, you know, we

22 can always extend his scheduling time.  So the only

23 reason why that officer, whoever's on duty, would get

24 that alert is if he doesn't come in by 3 o'clock.  And

25 then they're now alerted that he didn't enter his home.

17

Proceedings

1   So to resolve that, you know, his schedule can be

2   extended to an hour later which, like I was saying,

3   should allow for him to have time to return back to the

4   base which is somewhere in Bed Sty, Brooklyn, and then

5   from there to return back to his residence so that that

6   officer wouldn't get an alert and then there wouldn't be

7   an issue as far as scheduling.  So that's something that

8   also can happen.

9            THE COURT:  So in other words, give him more

10  flexibility so he has --

11           MS. GROSS:  Right.  Or give him --

12           THE COURT:  -- a little free time on the way

13  home.

14           MS. GROSS:  -- give him an extra half an hour,

15  an hour added onto his scheduling time so that he's able

16  to get from the Doe Fund back to his home within enough

17  time so that the officer is not getting an alert.  And

18  then there is no issues with compliance.

19           THE COURT:  And if he wanted to stop and get

20  something at McDonald's or somewhere else, could he do

21  that as long as he's within the time?

22           MS. GROSS:  So on home detention, we don't

23  allow for the defendants to stop at different places only

24  because it is restricted in the sense that we're just

25  allowing for the defendant to go where they have to go or

Proceedings

1  where they've been allowed to go, which in his case is

2  employment or he's also going to therapy treatment

3  sessions.  So we wouldn't allow for any stops in between

4  necessarily with home detention.  But like I said, we are

5  allowing him a lot of time out as far as his scheduling

6  being that he does have to be at the Doe Fund I believe

7  for 6 a.m. and then he does come back home I believe a

8  little after 3, 3:30, around 4 o'clock.

9           THE COURT:  If the Court were to permit him or

10  order that he be permitted to make a stop or two on the

11  way home, would that be inconsistent with home detention?

12  Or is that something the Court could do as part of --

13           MS. GROSS:  I believe so, I believe so.  I

14  would have to check but I don't believe that with home

15  detention we allow for any stops in between wherever the

16  destination is that the defendant has been allowed to go

17  to.

18           MS. WINIK:  Your Honor, may I weigh in for a

19  minute?  Because I think I've dealt with similar

20  situations.

21           THE COURT:  Okay.

22           MS. WINIK:  I think a lot of what the defendant

23  is asking to do like a stop or something on the way,

24  usually Pretrial allows on home detention as long as it's

25  communicated.  So all we're asking is that if he needs to

19

Proceedings

1  do his laundry like outside or whatever, or make a stop

2  or something, as long as he's in communication while on

3  home detention, electronic monitoring, with his Pretrial

4  Services officer, we don't have any objection.  It's the

5  lack of communication.  Our concern is that he will be

6  out there unsupervised, putting real people at risk.

7  After he cut a brake line, he said he wanted to do it

8  again.  All we ask is that Pretrial have the ability to

9  approve other activities that he may want to do while on

10  home detention between work and home.

11        THE COURT:  So it sounds as though what we're

12  looking at is trying to figure out within the structure

13  of home detention if there is a way to give Mr. Trapp, to

14  give you a little more freedom in what you're doing and

15  perhaps even to set up a schedule that would allow for

16  more freedom on the way to and from work.  And if that

17  were set up as a, instead of something that had to be

18  requested on each occasion that you want to do it, if it

19  could be set up as a normal schedule, that might make it

20  easier for Pretrial and for Mr. Trapp to be able to

21  handle that.

22        MS. OLIVERIA:  Your Honor, you know, it sounds

23  like what the Court is describing is a curfew.  And I'll

24  note for the record that we made -- our last bond

25  application was in September of last year.  And the

20

Proceedings

1   reason we made that application is because Melissa Roman,

2   through the Pretrial Services office, told us she didn't

3   object to a curfew.  So we made an application before

4   Judge Bloom.  The government opposed it, and Judge Bloom

5   denied the request.  I asked Pretrial Services whether

6   they would agree to a curfew now in the alternative.  The

7   answer was no.  I don't know what changed between

8   September and today other than now he has a steady job

9   that looks like it could be long term.

10          So I think in the alternative to taking him off

11  the monitor, he could be continued on the monitor and

12  subject to a curfew that would accommodate his work

13  schedule.  Something that I've seen the Pretrial Services

14  do under these circumstances is require the defendant to

15  let them know when they need to be out of the house.  I

16  think in Jeremy's case, in Mr. Trapp's case, it would be

17  something like 5 a.m. to -- I mean if they want to let

18  him pick up shifts at work, he could work I think until 8

19  or 9 p.m., but I think that would be the much more

20  workable solution.  It would reduce the burden on

21  Pretrial Services to have to constantly monitor his

22  whereabouts and they can still request verification that

23  he's going to work and when he's going to work.

24          THE COURT:  So I can't tell if this is just a

25  semantic problem or not, but it seems that the issue

Proceedings

1  really is that there is no -- I don't really see a major

2  objection from the government or from Pretrial Services

3  to giving Mr. Trapp some free time somewhere.  But the

4  question of what a curfew is as opposed to a schedule

5  that's authorized by Pretrial Services each time that he

6  wishes to take more time, that seems to be what the

7  debate is about.  And it would seem to me that it would

8  be easier just to set up either a schedule in advance

9  that everyone knows about and will agree to or call it a

10  curfew.  I don't think it matters what we call it.  I

11  think the idea is to give Mr. Trapp some more time

12  outside that is within the monitoring capabilities of

13  Pretrial Services and is approved by Pretrial Services.

14          MS. WINIK:  Your Honor --

15          THE COURT:  Is that what the government is

16  agreeing to essentially?

17          MS. WINIK:  Sort of, your Honor.  I strongly

18  object to taking the defendant off home detention.  I

19  agree that there's probably a schedule that we can come

20  up with which gives him some time before or after work.

21  But no, the government strongly believes that Pretrial

22  should be able to approve activities the defendant is

23  doing outside, you know, his work and his home based on

24  him being on home detention pending three months his

25  sentencing.

22

Proceedings

1        THE COURT:  And I think the question really is

2    what do we call it?

3        MS. WINIK:  I think it could be a home

4    detention where Pretrial approves certain activities.

5        THE COURT:  And so the question is can we pre-

6    approve some activities now or at some time within which

7    to do it so that Pretrial Services and Mr. Trapp don't

8    have to go through what some people might call the minuet

9    of having to go through the process every time --

10        MS. WINIK:  I just want to be clear --

11        THE COURT:  -- he needs a little more time.

12        MS. WINIK:  -- having worked with Ms. Roman for

13    a long time and Ms. Gross, Pretrial has been incredibly

14    accommodating.

15        THE COURT:  Oh, I know.

16        MS. WINIK:  And gone above and beyond to try to

17    facilitate this.

18        THE COURT:  Well I think it's a burden on

19    Pretrial Services and it's a burden on Mr. Trapp.

20        MS. WINIK:  Well just to be -- and I think this

21    is what Pretrial said at the last bail hearing which

22    Judge Bloom denied is that, or maybe Judge Bloom actually

23    said it, is that Pretrial is not coming to the Court

24    saying this is a burden for us.  Pretrial has been

25    working incredibly hard to make this work.  This is not

23

Proceedings

1    their motion.  They're not saying this is beyond our

2    resources.  It's the defendant saying this is beyond

3    Pretrial's resources, and that's not true for Pretrial.

4            But based on that, I believe that there's

5    probably some type of home detention schedule that

6    Pretrial hopefully can accept.

7            THE COURT:  Right.  Whether it's called a

8    curfew or whether it's called a preapproved schedule --

9            MS. WINIK:  Well, I think with a curfew,

10   Pretrial doesn't have to approve certain activities.  The

11   defendant can just do whatever before 10 o'clock at

12   night.  Whereas on home detention, the defendant can go

13   to work and his medical appointments, his mental health

14   treatment and educational opportunities.  Besides that,

15   Pretrial approves all the activities.

16           THE COURT:  All right.  So curfew is not

17   considered a schedule in the same way.  It's not

18   considered part of home detention but really what it is

19   in their vernacular, I mean without using the Court

20   terminology, it's just giving him a little more time to

21   do what he needs to do within his schedule.

22           MS. GROSS:  Right.

23           THE COURT:  So let me just ask Pretrial

24   Services, given that's what I think we're all looking to

25   do, keep the home detention but give Mr. Trapp a little

24

Proceedings

1    more free time without having to ask each time he needs

2    it.  Is there a way to do that?

3            MS. GROSS:  So your Honor, usually with

4    activities approved by Pretrial Services, which I believe

5    is how the ending of that condition goes, I don't think

6    that that would include Mr. Trapp being able to stop at

7    like a store or like things of that nature.

8            THE COURT:  Could the Court order that though

9    to permit that?

10           MS. GROSS:  I'm sorry, say that again, your

11   Honor?

12           THE COURT:  Could the Court make that part of

13   the conditions though?  In other words, that it would be

14   agreed that he could take an hour on -- the schedule that

15   we were talking about, whatever time he has to leave and

16   return, that during that period of time he's permitted to

17   go to work and/or on the way home or on the way to work

18   to stop at designated places.  Is that something the

19   Court could order within the structure of home detention?

20           MS. GROSS:  I mean typically I haven't, from

21   the defendants that are supervised, at least the ones

22   I've came in contact with, I haven't seen that as like a

23   modification.  But obviously if that's what your Honor

24   would want us to do, then that is what we will do.

25           But I mean I guess the whole issue more so is

25

Proceedings

1  of Mr. Trapp being on home detention opposed to the

2  curfew, like everyone stated, with the curfew he would be

3  allowed to do, you know, not whatever, but he'd be

4  allowed to work and he would have that free time to go

5  wherever it is that he would choose to go, you know,

6  within his travel restriction.  But again, with the risks

7  that were stated in the bail report, we just -- the whole

8  reason of why we want him on home detention is so that we

9  are able to monitor his movements, and you know, his

10  movements as far as how often he goes out and where he

11  goes is limited.  So with him being given a schedule or

12  his bond being modified to allow him to go for an hour

13  just go stop at the store, wherever, that could happen

14  but we -- I don't think it would -- we just wouldn't be

15  able to tell exactly what it is that he's doing in

16  regards to okay, he stops at a store but -- it just makes

17  it a little more difficult.

18         But like I said, if that's what your Honor

19  would want for us to do, then obviously that's something

20  that we would be able to do.  But it's just we just want

21  his movements to be limited as far as him going to work,

22  coming home, and we believe that that would mitigate the

23  risk of danger that was outlined in our report initially.

24         MS. OLIVERIA:  May I be heard, your Honor?

25         THE COURT:  Yes.

26

Proceedings

1          MS. OLIVERIA:  When someone is on home
2     detention, all activities require preapproval.  Right?
3     That's why Pretrial Services has to know, they don't let
4     them go to McDonald's because they didn't know beforehand
5     that he was going there and could not approve it.  So
6     with home detention there already is a court order
7     essentially on the bond saying that he can get food, he
8     can do other activities as approved by Pretrial Services,
9     he can work, he can go to school.  The issue is he has to
10    notify them of it beforehand.  They have to approve it.
11    And then he's allowed to do it.  And --
12          THE COURT:  But why can't we preapprove it now?
13    Why can't we say on Monday, Wednesdays, and Fridays he
14    has one hour extra to go to a store or some other place?
15          MS. OLIVERIA:  Because then I think what might
16    happen under those circumstances, and Ms. Gross can
17    clarify, is if he doesn't go straight from work there may
18    be an alert, he may get a phone call where are you right
19    now?
20          THE COURT:  Even if it's pre-approved?
21          MS. OLIVERIA:  It's possible.
22          THE COURT:  I mean if he needs it pre-approved,
23    instead of a 48-hour approval every time he wants to go
24    somewhere, can't we simply say we approve that on Monday,
25    Wednesdays, and Fridays he will have an extra hour?  He

27

Proceedings

1   can come home at 7 instead of 6, or whatever time it is.

2          MS. GROSS:  Your Honor, the only time that

3   we -- what Ms. Oliveria is saying is correct, but the

4   only time that we would get an alert is if Mr. Trapp

5   doesn't enter his home at the time that we gave him a

6   schedule to enter.  So if, like I said, if that's

7   something that your Honor would want us to do as far as

8   allowing him to stop along the route either going to work

9   or coming back home like a store or something, I mean I

10  guess that's something that we can do.  But again, we

11  wouldn't get an alert unless he leaves his home earlier

12  than he's supposed to or he returns later than he was

13  scheduled to.

14         THE COURT:  Okay.  That's helpful.3

15         MS. WINIK:  Your Honor, I think since we're

16  discussing the risk that Mr. Trapp presents of presenting

17  a danger to the community, under the Bail Reform Act he

18  have to discuss the nature and seriousness of that risk.

19  So --

20         THE COURT:  I think before you even get to

21  that, on page 439 of the transcript of the hearing before

22  Judge Pollak, I forget what date it was, May 17th, Judge

23  Pollak said, "I think he's demonstrated over the last

24  four months that he is not a danger to the community and

25  I'm hoping that he'll understand this relaxation of

28

Proceedings

1   conditions is an opportunity for him to move forward."

2   So I'm not changing Judge Pollak's finding that he's not

3   a danger, at least not a danger to the community whether

4   or not the alteration of the conditions would change that

5   finding.  I don't think so.  But I don't think we need to

6   get into that.  I don't think the government and the

7   defense need to argue about whether he is or not.

8              MS. OLIVERIA:  I only --

9              THE COURT:  I think there's precedent to say

10  Judge Pollak had made that finding and there's no reason

11  to --

12             MS. OLIVERIA:  I only mention it to the extent

13  that the government and Pretrial Services are taking the

14  position that the dangerousness that he presents is the

15  reason that he can't be on a curfew.  Now Judge Pollak

16  agreed that a relaxation of the conditions was

17  appropriate in May of last year, and that's what we're

18  asking for now.  It is not uncommon for defendants to be

19  downgraded from restrictive location monitoring

20  conditions as they comply and do well.  So Mr. Trapp did

21  well on four months of home incarceration before Judge

22  Pollak decided to downgrade him to home detention with

23  allowances for certain activities.  So now a year later

24  what we're asking for if it cannot be that he be taken

25  off electronic monitoring, we think a curfew would be an

29

Proceedings

1    appropriate relaxation of the conditions at this time.

2              THE COURT:  I understand.  The debate is

3    whether curfew or some other relaxation of the conditions

4    would be appropriate.  And at this point I'm suggesting,

5    or I might just order, that it would be appropriate to

6    relax the conditions by giving him in effect home

7    detention with a curfew.  But since that can't happen, it

8    would be home detention with pre-approved schedule for

9    him to have extra time to make stops on his way home from

10   work or to work.

11             MS. WINIK:  Your Honor, the government has no

12   objection to that.

13             THE COURT:  I'm sorry?

14             MS. WINIK:  The government has no objection to

15   that plan.

16             MS. OLIVERIA:  Then I would ask the Pretrial

17   Services office, since this is not I think something that

18   they ordinarily do, if it's what the Court is going to

19   order, we would want Mr. Trapp to know exactly how this

20   is going to work.  Does that mean that he sends a

21   schedule saying I have to work from 7 to 2 and then he

22   gets to come home at 4?  He still can't pick up

23   additional work shifts if he would want to.  What does

24   this mean for him?

25             MS. GROSS:  So we would still ask that Mr.

30

Proceedings

1   Trapp abide by the schedule that he's been given which I

2   believe is he's allowed to leave the home at 4:30 or 4:45

3   in the morning to get to work before 6.  And then he

4   finishes work at 2 I believe and he is supposed to be in

5   the home by 3 which we are actually going to extend that

6   only because I don't think that's enough time for him to

7   come back into the home.

8           However, I just have a question, your Honor.

9   As far as the stops, like what exactly -- is that just

10  stops like to the deli before he goes to work?  Things

11  like that or --

12          THE COURT:  (No audible response).

13          MS. GROSS:  Okay.  So I mean I guess Mr. Trapp

14  can still let us know I guess if he plans on stopping, if

15  he knows like on Friday he wants to go -- or he's

16  planning on going and stopping at the store on the route

17  to work, then that's something that he can let us know or

18  send us an email so that we're aware when we review his

19  movements that that's what he had asked to do.

20          THE COURT:  How long does it take him to get to

21  and from work?

22          MS. GROSS:  I'm sorry, you're asking me?

23          THE COURT:  Yes.  Whoever knows the answer to

24  that.

25          MS. GROSS:  I believe it takes him -- so he

31

Proceedings

1    doesn't live in the same neighborhood.  I believe it

2    takes him maybe an hour on average to get to work.  The

3    weekends may be a little different only because

4    transportation isn't running as frequently as it is

5    during the week.  But on average, about an hour,

6    sometimes maybe a little over an hour, sometimes maybe 50

7    minutes, a little under, a little over an hour.

8            THE COURT:  So if we give him two and a half

9    hours to get back from work, that would seem like an

10   ample amount of time to get something to eat if he wants

11   to on the way home or stop, do some shopping or whatever

12   he does.

13           MS. GROSS:  I mean I think two hours maybe I

14   guess.  Because I'm thinking -- I'm just trying to

15   remember the times that he comes in.  I think if he's --

16   usually I think he's coming in a little bit before 4 but

17   obviously after 3, so that's why we do have to extend

18   that.  Yeah, I think if he's given two hours maybe after

19   he's leaving the Doe Fund, an hour, hour 15 minutes to

20   travel, and then 20, 30 minutes to stop at a store or get

21   something to eat on the way home, I think that's

22   something that would work maybe.

23           MS. WINIK:  We would just ask for communication

24   between the defendant and Pretrial Services about this.

25           MS. OLIVERIA:  Your Honor, I think what I would

32

Proceedings

1   propose is perhaps giving him, for example, letting him

2   be out from 5 a.m. to 5 p.m. on the days that he works.

3   It would be like a curfew where he's only allowed to be

4   out from 5 to 5 on the days that he has to go to work.

5   And that way Pretrial Services will know he went to work

6   that day and won't necessarily have to be monitoring did

7   he go to the deli or did he go to the bank or did he do

8   his laundry and things like that.  I think that would be

9   much clearer for Mr. Trapp and for everyone to understand

10  what the parameters are.

11          THE COURT:  That's what I was thinking is home

12  detention with a curfew but we can't call it that.

13          MS. GROSS:  Right.

14          MS. OLIVERIA:  So I would call it a curfew but

15  with the added condition that he's only allowed to be out

16  on the days that he works with, as your Honor suggested,

17  maybe a couple of hours on his way home.

18          MS. WINIK:  I think the -- I mean I don't know

19  where he works or where he lives.  I don't have an

20  opinion on the time frame.  But what I do have an opinion

21  on is the fact that I have no objection to him making a

22  stop on the way to or from work to go to a deli and get a

23  sandwich or stop at an ATM.  What I have an objection to

24  is having from 5 to 5 where he can just do whatever he

25  wants regardless of if he's at work or not at work in

Proceedings

1  terms of if there's three hours where he's not at work,

2  he can just run around the city without telling Pretrial

3  Services where he is and getting approval for that.  So I

4  don't have any objection to the stop to do whatever needs

5  to be done, but I want to keep it narrow to he's still on

6  home detention, he still has to tell Pretrial what he's

7  doing during that time.

8          THE COURT:  I mean I think the way I would

9  phrase it would be he's permitted to leave the house at X

10  time and to return by such and such a time and on his way

11  to and from work he's permitted to do the following

12  things.  And if he wants to do something more than that,

13  he would have to get preapproval from Pretrial Services.

14  But he is deemed to have preapproval from Pretrial

15  Services to stop and get a sandwich, to do -- I don't

16  think laundry you're going to do on the way to work.  I'm

17  not sure what else you would want to put in the

18  preapproval but that's what we do, we fitted in that

19  preapproval slot.  You are preapproved to stop to get

20  something to eat, drink on the way home.

21          MS. WINIK:  The government has no objection to

22  that, your Honor.

23          THE COURT:  And if there's something else you

24  need to add to that, we could do it now.  Otherwise it

25  would be with the approval of Pretrial Services to do

34

Proceedings

1  more.  It's not that he wouldn't be permitted to do

2  something more if --

3          MS. OLIVERIA:  We'd request that he be given

4  permission to get food, to go to the bank, cash checks,

5  go to an ATM, ordinary financial transactions.  That he

6  be allowed to do laundry.  That he be allowed to go to

7  the gym if he can do it within the specified time frame.

8  And then I think beyond that, the only thing we would ask

9  for is that on the weekends he be permitted to go to

10  church and also do his laundry which I think is something

11  he already gets cleared from pretrial services.

12          THE COURT:  Yes, I think religious services are

13  typically exempt from that.

14          MS. WINIK:  Your Honor, in terms of the gym or

15  laundry, all of those things the defendant can do with

16  Pretrial approval.  We'd ask that he'd still have to

17  check with Pretrial before he does those things.  So I

18  have no objection to him stopping at an ATM, stopping at

19  the store to get a sandwich.  If it's something like

20  going to the gym for an hour, I don't even know if that's

21  permitted with home detention.  But all of those

22  activities beyond typical stop to and from work, you

23  know, can be these type things, I'd ask that he still

24  have to get approval from Pretrial Services before that

25  and not a blanket approval to do that on the way to work.

35

                          Proceedings

1          MS. WINIK:  All right.  Yes.  So I agree with

2    the government.  We would ask that he is permitted to get

3    approval prior to doing these activities only because

4    that helps us just kind of be able to narrow down on

5    where it is he's going and his movements which is the

6    whole reason why he's, I mean part of it of why he's on

7    home detention now.  It would help us to know where it is

8    that he's going.  And of course we'd be allowed to

9    approve it or disapprove it or times to not approve it,

10   but that would be something that would be helpful.

11          If Mr. Trapp is given -- I guess essentially if

12   he's allowed to leave at 5 and he comes back at 5, that

13   would basically be a curfew.  But again, the issue with

14   the curfew is that we don't feel comfortable with him

15   being allowed to move freely within that time.

16          And I'd also like to point out while Mr. Trapp

17   has been working with the Doe Fund for a little over a

18   month I believe now, in the event that he is given a

19   curfew, if he does part ways with the Doe Fund and he's

20   unemployed, that would still be the condition on his

21   bond.  So he would still be allowed to have that curfew

22   even if he's not working.  So that's also one reason why

23   we would still want for the home detention.  In regards

24   to him being allowed to stop at a store or for banking,

25   financial purposes, that's fine with us because we do

36

Proceedings

1   understand that, you know, he's receiving a check so he
2   would have to cash the check.  Even though I will say we
3   do give him a schedule for laundry every week I believe.
4   I don't remember if it's on Sundays.  It might be.  Or
5   sometime during the week.  However, we do give him a
6   schedule for that.  So I would also like to point out and
7   just let the Court know that if he did need to go to the
8   bank or something of that nature, he would be able to do
9   that also during that same time that he's allowed to go
10  out and do laundry.
11          But yes, we wouldn't feel comfortable at this
12  time with a curfew being imposed being that --
13          THE COURT:  Right.  He may not have a job
14  forever.
15          MS. GROSS:  Right.  And then --
16          THE COURT:  Just as long as he's working.
17          MS. GROSS:  -- technically he'd be allowed to
18  be outside and go wherever as long as it's within I
19  believe New York City and Long Island whichever it is on
20  his bond.  So that's one point that I'd like to just make
21  the Court aware of.
22          THE COURT:  So it looks as though what we have
23  here is we have permission to go to employment with the
24  Doe Fund and to leave at 5 in the morning and to -- is it
25  5 that's the best time?

37

Proceedings

1          MS. GROSS:  I think he'd have to leave a little

2    bit earlier than 5.

3          THE COURT:  4:30?

4          MS. GROSS:  Maybe like 4:30, 4:45 to get to

5    work by 6.

6          THE COURT:  Okay.  So permission to leave at

7    4:30, permission to return by 5.  And as long as he still

8    employed with the Doe Fund, to have an extra -- to be

9    permitted during those time periods to stop for food or

10   for banking or any other activities approved by Pretrial

11   Services.  So in other words, for banking and food you

12   don't have to get preapproval.  But for other activities

13   you would have to get preapproval.  And it can be long-

14   term preapproval.  You can say okay, for the next three

15   weeks you can do the laundry every Thursday or something

16   like that so he wouldn't have to call in every time.  I

17   don't think we have to get into more nitty-gritty details

18   on this.  I think we --

19         MS. WINIK:  The government has no objection to

20   that, your Honor.

21         MS. WINIK:  That's fine with Pretrial.

22         THE COURT:  Okay.  And Mr. Trapp, I just want

23   to say it sounds as though you're doing a really great

24   job of getting to the Doe Fund.  It's not easy to get up

25   early in the morning.  And doing that, I'm very familiar

Proceedings

1   with the Doe Fund and I'm glad that you're working there.

2          THE DEFENDANT:  I appreciate it, your Honor.

3          THE COURT:  Yes.  So keep up the good work with

4   the employment.  And the longer you're there, you know,

5   the more freedom you'll have.

6          MS. OLIVERIA:  Your Honor, I just want to

7   clarify something for the record.  Is 4:30 to 5 p.m.

8   every day or on the days that he works?

9          THE COURT:  On the days that he works, and the

10  days that he's working at the Doe Fund.  And if he

11  changes employment for whatever reason, you know, that

12  would be subject to modification and you all could work

13  it out.  And if you can't work it out, you'll come back

14  to court.

15         MS. OLIVERIA:  Mr. Trapp would also like the

16  opportunity, if he can, to pick up extra shifts at the

17  Doe Fund.  I know that there's a 7 to 2 shift and

18  sometimes there are shifts that work later.  For example,

19  I think last weekend, and Ms. Gross can correct me, he

20  was given overtime shifts and took them, and then the Doe

21  Fund had to verify that he was there.  Could we also add

22  that he's allowed to pick up additional shifts as long as

23  he can provide proof that he worked them?

24         THE COURT:  Well all he has to do is get

25  Pretrial Services approval for that.  I don't think it

39

Proceedings

1   should be difficult.  Right?  Pretrial Services wouldn't

2   have a problem if Mr. Trapp called one day and said

3   they're offering me overtime today, can I take it?

4           MS. GROSS:  So Mr. Trapp would have to provide

5   us with documentation ideally prior to because if he's

6   given a schedule let's say for Friday, today's Monday,

7   let's say he puts in a schedule today for Friday which is

8   what our protocol is that we have a schedule 48 hours in

9   advance or two business days in advance, the schedule is

10  for Friday from 7 to 2, and we allow him to leave the

11  home at 4:30 and come back at 5, the only thing is if we

12  don't have documentation before that he's picking up an

13  overtime schedule time, then whoever is on duty is still

14  going to get that alert that he's not home.  And then it

15  becomes kind of confusing if it's not me as his primary

16  officer that's on duty that knows the case and that knows

17  that he works at the Doe Fund that he may have picked up

18  an additional shift.

19          THE COURT:  So you're requesting 48 hour

20  approval and if you can be more flexible about it, you

21  will, but that's the requirement.

22          MS. GROSS:  Yes.  We definitely do need to know

23  in advance because if not, then it becomes difficult.

24          THE COURT:  That's reasonable.  Okay.  That's

25  reasonable.  Anything else?

Proceedings

40

1      MS. WINIK:  Nothing further from the

2  government, your Honor.

3          MS. OLIVERIA:  No, your Honor.

4          THE COURT:  All right.  Thank you.

5          MS. WINIK:  Thank you, Judge.

6          THE COURT:  Good luck, Mr. Trapp.

7          MS. GROSS:  Thank you.

8          THE DEFENDANT:  Thank you.

9              (Matter concluded)

10                  -oOo-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

41

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **24th** day of **June**, 2022.

*Mary Greco*

Transcriptions Plus II, Inc.